UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ENERGY CORPORATION OF AMERICA,
a West Virginia corporation; and
EASTERN AMERICAN ENERGY CORPORATION,
a West Virginia corporation,

      Plaintiffs

v.                                        Civil Action No. 2:07-0062

BITUMINOUS CASUALTY CORPORATION, an
Illinois corporation,

      Defendant

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending in this declaratory judgment proceeding is the motion for summary judgment of defendant Bituminous Casualty Corporation ("Bituminous"), filed September 4, 2007, followed by a corrected version, filed September 12, 2007.

I. Factual and Procedural Background

      Plaintiff Energy Corporation of America ("Energy") is a West Virginia corporation, primarily engaged in the business of oil and gas exploration, production, and marketing.  (Def.'s Mem. Supp. Mot. 2; Compl. ¶ 1).  Plaintiff Eastern American Energy Corporation ("Eastern") is Energy's wholly owned corporate subsidiary that is incorporated in and maintains its principal

place of business in West Virginia.  (Def.'s Mem. Supp. Mot. 2;
Compl. ¶ 2).  Eastern owns the mineral rights to and the state
drilling permit for the Yawkey #99 gas well located in Logan
County.  (Pls.' Mem. Opp'n Mot. 2; Def.'s Mem. Supp. Mot 4).


A. The Contract - Generally


        In October of 2005, Energy entered into a contract
("Contract") with S.W. Jack Drilling Company ("S.W. Jack") to
drill wells in Kentucky, Pennsylvania, and West Virginia,
including the Yawkey #99.  (Def.'s Mem. Supp. Mot. 3; Pls.' Mem.
Opp'n Mot. 2-3).  S.W. Jack is a Pennsylvania corporation.
(Def.'s Mem. Supp. Mot. 2).  Defendant Bituminous alleges that
S.W. Jack's principal place of business is Pennsylvania.  (Id.).
Plaintiffs contend that S.W. Jack's principal place of business
is West Virginia inasmuch as its Pennsylvania home office employs
only office personnel; most of its employees, including all
employees who drill wells, work in West Virginia; most of its
vehicles are located in West Virginia; and its operations are
primarily based in West Virginia.  (Pls.' Mem. Opp'n Mot. 4-5).

        The Contract was signed by Energy as the "Operator" and
S.W. Jack as the "Contractor"; Eastern was not a signatory to the

Contract.  (Contract ¶ 33).  It required both Energy and S.W.
Jack to obtain and maintain insurance coverage and to name the
other as an "additionally insured" for the liability specifically
assumed by each party in the Contract at paragraph 19.  (Id. ¶
17).  In accordance with this requirement, S.W. Jack obtained
insurance from defendant Bituminous, consisting of a commercial
general liability policy ("CGL Policy") and a commercial umbrella
liability policy ("Umbrella Policy").  (Def.'s Mem. Supp. Mot. 2-
3).

B. The Causes of Action

       On November 2, 2005, while S.W. Jack was drilling at
the Yawkey #99 gas well pursuant to the Contract, an S.W. Jack
employee was involved in an accident that resulted in his death.
(Pls.' Mem. Opp'n Mot. 2; Def.'s Mem. Supp. Mot. 4).  His estate
filed a wrongful death action ("Underlying Action") which is
currently pending in state court.  (Pls.' Mem. Opp'n Mot. 2).
Eastern, but not Energy, was named a defendant.  (Pls.' Mem.
Supp. Mot. 3).  The claims against Eastern include: negligent
hiring, vicarious liability, joint venture, strict liability,
wrongful death, and premises liability.  (Second Amended
Complaint, Jett v. E. Am. Energy Corp.).  Energy and Eastern

3

demanded that Bituminous assume the cost of the defense in the Underlying Action.  (Pls.' Mem. Supp. Mot. 2, 3).  Bituminous refused to do so.  (Id.).

Plaintiffs instituted the present action against Bituminous on January 26, 2007, based on diversity jurisdiction. Plaintiffs seek a declaration that Bituminous is obligated to defend Eastern in the Underlying Action and indemnify it to the extent of the policy limits for any liability Eastern may have to the estate of the decedent.  (Compl. ¶¶ 22-25).

C. The Contract's Allocation of Liability

As to the liability of the contractor, S.W. Jack, paragraph 19 of the Contract states "Contractor shall be liable, and shall release, indemnify, defend and hold Operator harmless, for any bodily injury to Contractor's . . . personnel, . . . solely caused by Contractor's negligence or willful misconduct." (Id. ¶ 19.1).  As to the liability of the Operator, Energy, paragraph 19 of the Contract states "except for the liabilities assumed by Contractor . . . Operator hereby assumes, and shall release, defend, indemnify and hold Contractor harmless at all times for any bodily injury to Contractor's . . . employees, . .

4

. regardless of how or when such damages or destruction occurs. . . ." (Id. ¶ 19.2).  The indemnity provision of the Contract extends the duty to indemnify to parent, holding, and affiliated companies of the parties to the Contract.  (Id. 19.7).


D. The CGL Policy


Bituminous promises in the CGL Policy to "pay those sums the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  (CGL Policy).  The CGL Policy gives Bituminous the right and duty to defend the insured against any suit seeking those damages.  (Id.).  The CGL Policy further states that the insurance applies only if the bodily injury or property damage (1) is caused by an "occurrence" that takes place in the "coverage territory," (2) occurs during the policy period, and (3) is unknown to the insured prior to the policy period. (Id.).

The CGL Policy defines its "coverage territory" as "The United States of America (including its territories and possessions), Puerto Rico and Canada . . . ."  (Def.'s Mem. Supp. Mot. 2-3).  Thus the "coverage territory" included S.W. Jack's

5

drilling operations in Pennsylvania, West Virginia, and Kentucky.

The CGL Policy defines "insureds" as S.W. Jack and its
volunteer workers and employees, with some restrictions.  (<u>Id.</u> 12
(quoting CGL Policy)).  It further states in an amendment that an
"additional insured" is:

> Any person or organization for whom you [S.W. Jack] are
> performing operations <u>if you and such person or</u>
> <u>organization have agreed in a written contract or</u>
> <u>written agreement executed prior to any loss that such</u>
> <u>person or organization will be added as an additional</u>
> <u>insured on your policy</u> . . .

(<u>Id.</u> 12 (quoting CGL Policy and adding emphasis); Pls.' Mem.
Opp'n Mot. 12).

The CGL Policy excludes from coverage "'[b]odily
injury' or 'property damage' for which the insured is obligated
to pay damages by reason of the assumption of liability in a
contract or agreement."  (CGL Policy).  It then excepts from this
exclusion "liability for damages. . . (2) [a]ssumed in a contract
or agreement that is an 'insured contract' . . . ."  (<u>Id.</u>).  The
CGL Policy defines an "insured contract" as, among other things:

> That part of any other contract or agreement pertaining
> to your [S.W. Jack's] business . . . under which you
> assume the tort liability of another party to pay for
> "bodily injury" or "property damage" to a third person
> or organization.  Tort liability means a liability that
> would be imposed by law in the absence of any contract
> or agreement.

(Def.'s Mem. Supp. Mot. 18 (quoting CGL Policy)).

## II. Preliminary Matters

### A. Ripeness

Plaintiffs allege that the motion for summary judgment is premature inasmuch as Bituminous refuses to provide information requested by Plaintiffs in discovery. (Pls.' Mem. Opp'n Mot. 1-2). Bituminous responds that the Contract, the insurance policies, and the complaint in the Underlying Action have been disclosed and that the information sought by plaintiffs is evidence extrinsic to the contracts and unnecessary for resolution of the motion for summary judgment. (Def.'s Reply 2).

This issue was addressed by Magistrate Judge Mary E. Stanley in her resolution of Defendant's motion for a protective order. In her memorandum opinion and order granting that motion, the magistrate judge appropriately found that regardless of whether the court applied West Virginia or Pennsylvania law, extrinsic evidence is not admissible unless the contract is found to be ambiguous. (Mem. Op. & Ord., Oct. 25, 2007). Thus, discovery is not warranted unless and until the court determines

7

that the policies are ambiguous. (<u>Id.</u>). Bituminous's motion for summary judgment is ripe for consideration.

B. Standing

Bituminous contends that Energy has not been named as a defendant in the Underlying Action and thus has no standing to assert rights under the insurance policies. (Def.'s Mem. Supp. Mot. 1 n.2). Plaintiffs counter that Energy has a sufficient stake in the outcome to confer standing to seek a declaratory judgment because it is "vindicating" a contractual right to indemnification that it secured for its subsidiary, Eastern. (Pls.' Mem. Opp'n Mot. 3 n.2). According to plaintiffs, the duty to indemnify found at paragraph 19.7 of the Contract expressly runs to and benefits Energy and all of its affiliates. (<u>Id.</u> 3).

For a federal court to possess the authority to hear a case before it, the plaintiff must have both Article III and statutory standing. <u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 541 (1986). On the subject of constitutional standing, the Supreme Court of the United States has stated that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of

8

federal-court jurisdiction to actual cases or controversies."
Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976).
"Article III standing . . . enforces the Constitution's case-or-
controversy requirement." Elk Grove Unified Sch. Dist. v.
Newdow, 542 U.S. 1, 11 (2004). To have Article III standing,
"[a] plaintiff must allege personal injury fairly traceable to
the defendant's allegedly unlawful conduct and likely to be
redressed by the requested relief." Allen v. Wright, 468 U.S.
737, 751 (1984); see Friends of the Earth, Inc. v. Laidlaw Envt'l
Servs. Inc., 528 U.S. 167, 180-81 (2000).

Identifying Eastern's injury is simple inasmuch as it
was sued in the Underlying Action. It is more difficult to
identify the injury suffered by Energy which was not named a
party in that action. The issue in this action, as framed by
plaintiffs, is essentially whether Eastern is a beneficiary of
the insurance policies issued by Bituminous to S.W. Jack as a
result of the Contract between Energy and S.W. Jack. The injury
to Energy, also as framed by plaintiffs, is that Energy is being
denied a right that it secured to benefit Eastern. It is a
generally recognized principle of law that a promisee has a right
to enforce a contract made for the benefit of another. See
Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d

9

415, 422 (3d Cir. 1999)(citing Restatement (Second) of Contracts
§ 305 and applying Pennsylvania law). Based upon this principle,
Energy has alleged an "injury in fact," namely, protection of a
right allegedly secured by it to benefit Eastern.

This injury is fairly traceable to Bituminous because
Bituminous issued the insurance policies alleged to cover
plaintiffs. Moreover, this injury could be remedied were the
court to declare that Bituminous has a duty to defend and
indemnify Eastern. Thus plaintiffs have satisfied the
constitutional standing requirements.

However, a plaintiff who has Article III standing may
still be prevented from prosecuting its suit in federal court if
it lacks statutory standing. Bennett v. Spear, 520 U.S. 154,
162-63 (1997). To establish standing under the federal
Declaratory Judgment Act, a plaintiff must present the existence
of a substantial controversy between parties having adverse
interests of sufficient immediacy and reality to warrant issuance
of a declaratory judgment. Scott v. Pasadena Unified Sch. Dist.,
306 F.3d 646, 658 (9th Cir. 2002). Whether the subject of a
declaratory judgment action is a sufficiently live controversy
rather than an abstract question "is necessarily one of degree,
and it would be difficult, if it would be possible, to fashion a

10

precise test for determining in every case whether there is such a controversy." <u>Md. Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Id.</u>

Energy has alleged sufficient facts to demonstrate statutory standing under the Declaratory Judgment Act. The facts alleged by the plaintiffs demonstrate a substantial controversy over the interpretation of the Contract and the insurance policies issued by Bituminous. The plaintiffs' interests are plainly adverse to those of Bituminous, each party having a different interpretation of the rights, if any, available to plaintiffs under the Contract and the insurance policies. Finally, the impending action against Eastern makes the need for a declaration by the court sufficiently immediate and real. Thus, the court is satisfied that both plaintiffs have satisfied the requirements for statutory as well as constitutional standing.

11

C. Conflict of Laws


As a preliminary matter to Bituminous's motion for summary judgment, the court must also consider whether to apply West Virginia or Pennsylvania principles of contract interpretation.  Bituminous contends that the court is obligated to apply Pennsylvania law in interpreting the policies because the policies were issued by a Pennsylvania broker in Pennsylvania to a Pennsylvania corporation.  (Def.'s Mem. Supp. Mot 9). Plaintiffs, on the other hand, contend that West Virginia law obtains inasmuch as (1) S.W. Jack's home office in Pennsylvania employs only office personnel; (2) most of S.W. Jack's employees, including all well drillers, work out of West Virginia locations; (3) most of S.W. Jack's vehicles are kept and used in West Virginia; and (4) "at the time of the renewal of its Bituminous policies for 2005-2006, S.W. Jack anticipated that the greatest amount of drilling during the policy period would be in West Virginia."  (Pls.' Mem. Opp'n Mot. 4-5).

When exercising diversity jurisdiction, a federal district court must apply the choice-of-law rules of the state in which it sits.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941).  Accordingly, West Virginia conflicts rules

12

apply.  The first step in any conflicts analysis is to
characterize the type of issue involved in order to determine
what West Virginia conflict rule to apply.  <u>Liberty Mut. Ins. Co.
v. Triangle Indus., Inc.</u>, 182 W. Va. 580, 583, 390 S.E.2d 562,
565 (1990).  The West Virginia Supreme Court of Appeals has held
that "the interpretation of insurance policy coverage, rather
than liability, is treated as a contract question for purposes of
conflicts analysis." <u>Id.</u>

The West Virginia Supreme Court of Appeals addressed
this issue in <u>Triangle Industries</u>.  There, a commercial general
liability insurance policy was issued in New Jersey to insure a
New Jersey company with a number of processing plants located in
several states, including one in West Virginia.  <u>Id.</u> at 563.  The
damage giving rise to the declaratory judgment action brought by
the insurance company against the insured occurred in Ohio when
the West Virginia processing plant shipped toxic sludge to an
Ohio landfill.  <u>Id.</u> at 566.  The court began its analysis by
considering Restatement (Second) of Conflict of Laws § 193, which
states:

> The validity of a contract of fire, surety or casualty
> insurance and the rights created thereby are determined
> by the local law of the state which the parties
> understood was to be the principal location of the
> insured risk during the term of the policy, unless with
> respect to the particular issue, some other state has a

13

> more significant relationship under the principles
> stated in § 6 to the transaction and to the parties, in
> which event the local law of the other state will be
> applied.

Id. at 566; Restatement (Second) of Conflict of Laws § 193.  Then

it turned to § 6 of the Restatement, which outlines a number of

factors for courts to consider in identifying the state with the

most significant relationship.  These factors are:

> (a)  the needs of the interstate and international
>      systems,
> (b)  the relevant policies of the forum,
> (c)  the relevant policies of other interested states
>      and the relative interests of those states in the
>      determination of the particular issue,
> (d)  the protection of justified expectations,
> (e)  the basic policies underlying the particular field
>      of law,
> (f)  certainty, predictability and uniformity of
>      result, and
> (g)  ease in the determination and application of the
>      law to be applied.

Triangle Industries, 390 S.E.2d at 567 (citing Restatement

(Second) of Conflict of Laws, § 6).


        After considering the § 6 factors, the court concluded

that the law of the state of contract, New Jersey, should apply.

Id.  It found that this result would best ensure "certainty,

predictability, and uniformity of result" and "ease in the

determination and application of the law to be applied," and that

"[g]iven the increasingly complex nature of the insurance

industry, . . . the needs of the 'interstate' system of insurance

14

require that law be applied in the most uniform and predictable
manner possible." <u>Id.</u> In supporting its conclusion, the court
summarized:

> Quite simply, we believe that, absent specific
> provisions to the contrary, it is infinitely more
> practicable to permit one policy to cover the numerous
> contracts rather than to require both Triangle and the
> insurance companies to negotiate individual policies
> based upon each state where an insured risk is located.
> When carefully weighed, we conclude that the factors
> tilt in favor of the law of the place of contract.

<u>Id.</u> In concluding its opinion, the court articulated a new
conflict of laws rule:

> [I]n a case involving the interpretation of an
> insurance policy, made in one state to be performed in
> another, the law of the state of the formation of the
> contract shall govern, unless another state has a more
> significant relationship to the transaction and the
> parties, or the law of the other state is contrary to
> the public policy of this state.

<u>Id.</u>

Applying this rule, the court begins with the
presumption that Pennsylvania law governs because the policies
were issued in Pennsylvania.[1] Turning to the § 6 factors, the

---

[1] Plaintiffs contend that <u>Pen Coal Corp. v. William H. McGee
& Co., Inc.</u>, rather than <u>Triangle Industries</u>, obtains. <u>Pen Coal</u>
involved a commercial industrial insurance policy, the terms of
which covered physical loss of or damage to two specific pieces
of property at specific locations in different states other than
the state of formation. 903 F.Supp. 980, 985 (S.D.W.Va. 1995)
(Goodwin, J.). The covered risks were valued separately on the
declarations page and the policy provided that the insurance

court concludes that no other state has a more significant

relationship to the transaction and the parties than

Pennsylvania.  As explained in Triangle Industries, application

of the law of the state of formation ensures "certainty,

predictability, and uniformity of result" and "ease in the

determination and application of the law to be applied."

Triangle Industries, 390 S.E.2d at 567.  Furthermore, the

_____

company would "pay for direct physical loss of or damage to
covered property at the premises described."  Id. at 982.  In
determining which state's law governed the interpretation of the
policy, the court applied § 193 and determined that it should
apply the law of the location of the risk, rather than that of
the place of formation.  Id. at 987.

     The CGL Policy and the Umbrella Policy here, covering
drilling operations contemplated in Pennsylvania (the place of
formation) as well as two other states, are distinguishable from
the insurance contract in Pen Coal.  The CGL Policy covers S.W.
Jack to the extent it becomes legally obligated to pay damages
because of "bodily injury" or "property damage" as the result of
an "occurrence" that takes place within the "coverage territory."
(CGL Policy).  It defines "coverage territory" as "[t]he United
States of America (including its territories and possessions),
Puerto Rico and Canada . . . ."  (Id.).  In other words, the CGL
Policy follows S.W. Jack wherever it goes within the broad
"coverage territory," so there is no principal location of the
insured risk.  The same is true for the Umbrella Policy.  As
noted by the court in Pen Coal, comprehensive general liability
policies that cover insured property regardless of location, such
as that in Triangle Industries, are distinguishable from policies
in which the risks are isolated for the purpose of valuation, as
was the case in Pen Coal.  Id. at 985; see also APAC-Atlantic,
Inc. v. Protection Servs., Inc., 397 F.Supp.2d 792 (N.D.W.Va.
2005)(finding that the law of the state of formation governed the
interpretation of an insurance policy that listed the entire
United States as its coverage territory).

uniformity and predictability of this rule satisfy the needs of
the interstate system of the insurance industry.  Id.  Finally,
application of this rule results in the selection of a single
rule of law for the contract, and thus, the parties to the
contract do not have to negotiate separate contracts for each
state where an insured risk is located.  Id.

        The court's final inquiry is whether Pennsylvania's
contract interpretation principles are contrary to the public
policy of West Virginia.  They are not; rather, the laws are
nearly identical.  Thus, the court will apply Pennsylvania law to
Bituminous's motion for summary judgment.


                        III. Governing Standards


A. Summary Judgment


        A party is entitled to summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Material facts are those necessary to

                               17

establish the elements of a party's cause of action.  <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the
record and all reasonable inferences drawn therefrom in a light
most favorable to the non-moving party, a reasonable fact-finder
could return a verdict for the non-movant.  <u>Id.</u>  The moving party
has the burden of showing -- "that is, pointing out to the
district court -- that there is an absence of evidence to support
the nonmoving party's case."  <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 325 (1986).  If the movant satisfies this burden, then the
non-movant must set forth specific facts as would be admissible
in evidence that demonstrate the existence of a genuine issue of
fact for trial.  Fed. R. Civ. P. 56(c); <u>id.</u> at 322-23.  A party
is entitled to summary judgment if the record as a whole could
not lead a rational trier of fact to find in favor of the non-
movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the
evidence is sufficient for a reasonable fact-finder to return a
verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at
248.  Even if there is no dispute as to the evidentiary facts,
summary judgment is also not appropriate where the ultimate
factual conclusions to be drawn are in dispute.  <u>Overstreet v.</u>

18

<u>Ky. Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B. Contract Interpretation

Our court of appeals has observed that the matter of "[c]ontract interpretation is a subject particularly suited for summary judgment . . . ." <u>Bank of Montreal v. Signet Bank</u>, 193 F.3d 818, 835 (4th Cir. 1999). It has also been observed repeatedly, however, that "[a]n ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate." <u>Sempione v. Provident Bank</u>, 75 F.3d 951, 959 (4th Cir. 1996). Expanding upon this analysis, the court of

19

appeals has stated:

> Only an unambiguous writing justifies summary judgment
> without resort to extrinsic evidence, and no writing is
> unambiguous if "susceptible to two reasonable
> interpretations." <u>American Fidelity & Casualty Co. v.
> London & Edinburgh Ins. Co.</u>, 354 F.2d 214, 216 (1965).
> . . .  If a court properly determines that the contract
> is unambiguous on the dispositive issue, it may then
> properly interpret the contract as a matter of law and
> grant summary judgment because no interpretive facts
> are in genuine issue. Even where a court, however,
> determines as a matter of law that the contract is
> ambiguous, it may yet examine evidence extrinsic to the
> contract that is included in the summary judgment
> materials, and, if the evidence is, as a matter of law,
> dispositive of the interpretative issue, grant summary
> judgment on that basis. <u>See Jaftex Corp. v. Aetna
> Casualty and Surety Co.</u>, 617 F.2d 1062, 1063 (4th
> Cir.1980).  If, however, resort to extrinsic evidence
> in the summary judgment materials leaves genuine issues
> of fact respecting the contract's proper
> interpretation, summary judgment must of course be
> refused and interpretation left to the trier of fact.
> <u>World-Wide Rights Ltd. Partnership v. Combe Inc.</u>, 955
> F.2d 242, 245 (4th Cir.1992).

<u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1126 (4th Cir.
1993).  The court of appeals has also observed "[i]f there is
more than one permissible inference as to intent to be drawn from
the language employed, the question of the parties' actual
intention is a triable issue of fact." <u>Atalla v. Abdul-Baki</u>, 976
F.2d 189, 192 (4th Cir. 1992)(quoting <u>Bear Brand Hosiery Co. v.
Tights, Inc.</u>, 605 F.2d 723, 726 (4th Cir. 1979) (quoting <u>Am. Fid.
& Cas. Co. v. London & Edinburgh Ins. Co.</u>, 354 F.2d 214, 216 (4th
Cir. 1965)).

Principles of Pennsylvania law governing the

interpretation of insurance contracts are well settled:

> The task of interpreting a contract is generally
> performed by a court rather than by a jury.  See
> Gonzalez v. United States Steel Corp., 484 Pa. 277, 398
> A.2d 1378 (1979); Community College of Beaver County v.
> Society of the Faculty, 473 Pa. 576, 375 A.2d 1267
> (1977).  The goal of that task is, of course, to
> ascertain the intent of the parties as manifested by
> the language of the written instrument.  See Mohn v.
> American Casualty Co. of Reading, 458 Pa. 576, 326 A.2d
> 346 (1974).  Where a provision of a policy is
> ambiguous, the policy provision is to be construed in
> favor of the insured and against the insurer, the
> drafter of the agreement.  See Mohn v. American
> Casualty Co. of Reading, supra.  Where, however, the
> language of the contract is clear and unambiguous, a
> court is required to give effect to that language.  See
> Pennsylvania Manufacturers' Ass'n Insurance Co. v.
> Aetna Casualty & Surety Insurance Co., 426 Pa. 453, 233
> A.2d 548 (1967).

Standard Venetian Blind Co. v. Am. Empire Ins. Co., 503 Pa. 300,

304-305, 469 A.2d 563, 566 (Pa. 1983).  The court must construe

contract language as written and may not modify its plain meaning

under the guise of interpretation.  General Refractories Co. v.

Ins. Co. of N. Am., 906 A.2d 610 (Pa. 2006).


IV. Analysis


Bituminous moves for summary judgment on the grounds

that the terms of the policies are clear and unambiguous and do

21

not provide Eastern with a right to indemnification and a defense

by Bituminous. (Def.'s Mot. 2). Plaintiffs counter that the

Contract is an "insured contract," which is covered by the

policies, and that under the terms of the Contract, Bituminous's

duty to indemnify extends to Eastern as well as Energy. (Pls.'

Mem. Opp'n Mot. 8). Bituminous responds that the provisions of

the Contract are clear and do not meet the requirements of the

CGL Policy's definition of an "insured contract." (Def.'s Reply

13). Alternatively, plaintiffs contend that under the terms of

the CGL Policy, Eastern is an "additional insured" and thus

covered by the CGL Policy. (Pls.' Mem. Opp'n Mot. 12).

Bituminous disputes that as well. (Def.'s Reply 18).


A. The CGL Policy


1. Whether the Contract is an "Insured Contract"


        The analysis of whether the Contract is an "insured

contract" begins with the language of the CGL Policy, which as

earlier noted defines an "insured contract" as follows:

> That part of any other contract or agreement pertaining
> to your business . . . <u>under which you [S.W. Jack]</u>
> <u>assume the tort liability of another party to pay for</u>
> <u>"bodily injury" or "property damage" to a third person</u>
> <u>or organization</u>. Tort liability means a liability that

22

> would be imposed by law in the absence of any contract
> or agreement.

(CGL Policy (emphasis added)).  Although plaintiff contends that

"[i]t is basic insurance law that a contractual indemnity

obligation is an 'insured contract' under the indemnitor's

commercial general liability policy," the court rejects this

argument because it ignores the existence of the express

contractual language just quoted that provides a definition for

the term "insured contract."  When Pennsylvania courts encounter

such language, they rely on the contractual definition rather

than basic principles of insurance law.  See Tremco, Inc. v. Pa.

Mfgrs. Ass'n Ins. Co., 832 A.2d 1120 (Pa. 2003); Brooks v.

Colton, 760 A.2d 393 (Pa. 2000).  This language is not

"susceptible to two reasonable interpretations"; rather, it is

clear and unambiguous.  See Atalla, 976 F.2d at 192.  Thus, in

determining whether the Contract constitutes an "insured

contract," the court will give effect to the intent of the

parties as indicated by the clear language of this definition

without reference to extrinsic evidence.  See Goodman, 7 F.3d at

1126.

     In the Contract S.W. Jack agrees to assume liability

for and indemnify, release, defend, and hold Energy harmless for

"any bodily injury to Contractor's [S.W. Jack's] . . . employees

23

. . . <u>solely caused by Contractor's negligence or willful</u>
<u>misconduct</u>." (Contract ¶ 19.1 (emphasis added)). Except for
this liability assigned to S.W. Jack, Energy expressly agrees to
be liable for other damages "regardless of how or when such
damages or destruction occurs." (<u>Id.</u> ¶ 19.2). Inasmuch as S.W.
Jack assumes responsibility only for damages "solely caused by
Contractor's [S.W. Jack's] negligence or willful misconduct,"
S.W. Jack does not assume the liability of anyone other than
itself. Thus, the contract is not a contract under which S.W.
Jack "assume[s] the tort liability <u>of another party</u> . . . ."
Accordingly, the Contract is not an "insured contract" under the
clear and unambiguous terms of the CGL Policy.


2. Whether Eastern is an "Additional Insured"


        Plaintiffs argue in the alternative that Eastern is an
"additional insured" under the terms of the CGL Policy. (Pls.'
Mem. Opp'n Mot. 12). As earlier noted, the CGL Policy language
defining an "additional insured" provides:

>  Any person or organization for whom you [S.W. Jack] are
>  performing operations if you and such person or
>  organization have agreed in a written contract or
>  written agreement executed prior to any loss that such
>  person or organization will be added as an additional
>  insured on your policy . . . .

(CGL Policy).

The court notes that the parties do not contest whether Energy was an additional insured under the CGL Policy. (Pls.' Mem. Opp'n Mot. 12; Def.'s Mem. Supp. Mot. 2). Rather, Bituminous contends that regardless of Energy's status as an "additional insured," Eastern was neither a party to the Contract nor a party to any other written contract with S.W. Jack in which S.W. Jack agreed to name Eastern as an "additional insured," and therefore was not an "additional insured." (Def.'s Mem. Opp'n Mot. 12-13). Plaintiffs contend, on the other hand, that Eastern is an "additional insured" because (1) S.W. Jack agreed to obtain insurance to cover certain liabilities and have Energy named as an "additional insured" "to the extent of the indemnification obligations" and (2) S.W. Jack's indemnification obligation extended to Energy's subsidiaries.

The court finds that the language of the CGL Policy defining "additional insured" is clear and unambiguous inasmuch as it is not "susceptible of two reasonable interpretations." See Atalla, 976 F.2d at 192. Thus, in determining whether Eastern is an "additional insured," the court will give effect to the intent of the parties as indicated by the clear language of this definition without reference to extrinsic evidence. See

25

Goodman, 7 F.3d at 1126.  The definition requires a person or
organization, in order to be an "additional insured," to (1) be a
person or organization for whom the insured is performing
operations and (2) be a party to a written agreement, executed
prior to any loss, in which the insured agrees to add the person
or organization as an additional insured on the CGL Policy.
Viewing the facts in a light most favorable to the plaintiffs,
the court assumes that Eastern was an organization for whom S.W.
Jack was performing operations from the fact that Eastern owned
the mineral rights to and the state drilling permit for the
Yawkey #99 well.  However, no contract has been produced in which
S.W. Jack agrees in writing that S.W. Jack would add Eastern as
an additional insured on the CGL Policy.

     Looking to the terms of the Contract, and considering
plaintiffs' argument that Bituminous owes a duty to defend and
indemnify Eastern because S.W. Jack's indemnification obligation
extended to Energy's subsidiaries, the court's conclusion remains
unchanged.  S.W. Jack agreed to obtain and maintain insurance
coverage and to name Energy as an "additional insured" for the
liability specifically assumed by S.W. Jack in the Contract at
paragraph 19.  (Contract ¶ 17).  Thus, S.W. Jack caused Energy to
be named an "additional insured" on its CGL Policy to the extent

26

S.W. Jack was liable for any damages "solely caused by [S.W. Jack's own] negligence or willful misconduct."  (<u>Id.</u> ¶ 19.1).

The indemnity provision of the Contract extends S.W. Jack's indemnification duty to Energy's "affiliated companies" and thus perhaps to Eastern.  (<u>Id.</u> ¶ 19.7).  And so, the indemnity provision can be read to require S.W. Jack to indemnify Eastern and hold Eastern harmless for any damages "solely caused by [S.W. Jack's own] negligence or willful misconduct."  (<u>Id.</u> ¶ 19.1).  However, as aptly noted by Bituminous in its reply brief, plaintiffs confuse <u>S.W. Jack's duty</u> under the Contract to indemnify Energy and its affiliates with <u>Bituminous's duty</u> under the CGL Policy to pay to insureds and additional insureds sums that they become legally obligated to pay as damages.  The language of these two agreements simply does not support a reading by which Bituminous owes a duty to Eastern.

B. The Umbrella Policy

In the commercial umbrella liability policy ("Umbrella Policy"), Bituminous agrees to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' caused by an 'occurrence'

27

which takes place during the policy period and in the 'coverage territory.'" (Umbrella Policy). The insureds under the Umbrella Policy include S.W. Jack; its executive officers, directors, stockholders, employees; and "any person or organization . . . which qualifies as an insured in any 'underlying insurance.'" (Id.). The CGL Policy is an underlying insurance. (Id.). The definition for an "insured contract" in the Umbrella Policy is the same as that contained in the CGL Policy. (Id.).

The parties devote little argument to the terms of the Umbrella Policy. Bituminous notes in a footnote that the Umbrella Policy "does not afford coverage to additional insureds." (Def.'s Mem. Supp. Mot. 2 n.3). Plaintiff responds that the Umbrella Policy defines insured as "any person or organization . . . which qualifies as an insured in any 'underlying insurance;'" that, in its view, Eastern is an insured under the CGL Policy; and, as a result, it is covered by the Umbrella Policy. (Pls.' Mem. Opp'n Mot. 13 n.12).

Like the language of the CGL Policy, the language of the Umbrella Policy is clear and unambiguous because it is not "susceptible of two reasonable interpretations." See Atalla, 976 F.2d at 192. Thus, in determining whether Eastern is covered by the Umbrella Policy, the court will give effect to the intent of

28

the parties as indicated by the clear language of the Umbrella
Policy without reference to extrinsic evidence.  See Goodman, 7
F.3d at 1126.

Eastern is clearly not an insured under the express
terms of the Umbrella Policy.  The Umbrella Policy defines an
insured as S.W. Jack; its executive officers, directors,
stockholders, employees; and "any person or organization . . .
which qualifies as an insured in any 'underlying insurance.'"
(Umbrella Policy).  The CGL Policy is an underlying insurance.
(Id.).  The court has already determined that Eastern is not an
insured or "additional insured" under the CGL Policy, thus it
cannot be an insured under the Umbrella Policy either.
Furthermore, the Umbrella Policy defines an "insured contract" in
the same language that is used in the CGL Policy.  (Id.).  The
court has already determined that the Contract is not an "insured
contract" under this language.


                          V. Conclusion


Inasmuch as the terms of the CGL Policy and the
Umbrella Policy are clear and unambiguous, no interpretive facts
are in genuine issue.  See Goodman v. Resolution Trust Corp., 7

F.3d at 1126. Under the plain terms of the CGL Policy and the
Umbrella Policy, Eastern has no right to indemnity or a defense
from Bituminous. Thus, summary judgment in favor of Bituminous
is proper.

Based upon the foregoing, it is ORDERED that
Bituminous's motion for summary judgment be, and it hereby is,
granted. Additionally, the court declares that Bituminous need
not defend or indemnify Eastern in the Underlying Action, styled
Larry Jett, as Administrator of the Estate of Andrew John Murphy
v. Eastern American Energy Corporation, a West Virginia
Corporation, et al., Civil Action No.: 06-C-151 (Circuit Court of
Logan County, West Virginia), pursuant to the CGL Policy or the
Umbrella Policy.

The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

DATED:  February 4, 2008

John T. Copenhaver, Jr.
United States District Judge

30